IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| **OWEN INDUSTRIES, INC. D/B/A PAXTON & VIERLING STEEL CO.** <br> Plaintiff, <br><br> v. <br><br> **BECHTEL NATIONAL INC.** <br> Defendant.. | Case No. _____ <br><br> **COMPLAINT** |

Plaintiff, Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. ("PVS"), by and through the undersigned counsel, for its Complaint against Defendant Bechtel National Inc. ("BNI"), states as follows:

## INTRODUCTION

1. Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. ("PVS")—an Iowa steel fabricator—brings this action to recover improperly withheld payments and compensation for changes made and impacts caused by Defendant BNI on the "Mobile Launcher 2" project (the "Project"). The Project was undertaken for the National Aeronautics and Space Administration ("NASA") as part of NASA's Artemis program to launch rockets and spacecrafts to the moon.

2. BNI served as the general contractor and designer for the Project. When it engaged PVS as its subcontractor to fabricate the steel for the 355-foot-tall, 11.3-million-pound launcher structure, the parties anticipated completion of the steel fabrication by the end of 2021.

3. It was not until mid-2025, however, that PVS was able to complete its fabrication of steel for the Project—almost four years after the original expected completion date. The Project costs overran by billions of dollars, and at least two public reports by the Office of Inspector General for NASA critiqued BNI's handling and management of the Project.

4. During the Project, among other things: (i) the cost and scope of PVS's purchase order with BNI ballooned from $29,000,000 to over $185,000,000; (ii) PVS received more than 6,250 "issued for construction" design releases from BNI over a three-year period, and in turn PVS was required to issue more than 3,000 "requests for information" to question and clarify errors, omissions, and ambiguities in BNI's design; and (iii) PVS managed teams of steel fabricators and other subcontractors throughout various regions of the country to fabricate the steel as quickly as possible despite the piecemeal release of design information and frequent changes by BNI.

5. Even though PVS took tremendous efforts to complete its work notwithstanding the difficulties imposed by BNI, BNI has improperly withheld funds due to PVS and refused to pay PVS fully for changes and impacts to the work that BNI caused.

6. BNI's motives in withholding PVS's funds and failing to process its requests for equitable adjustment are unclear, but certain actions suggest a deeper story—such as (i) BNI's seeming failure to notify NASA of its withholdings from PVS as required under Federal Acquisition Regulation ("FAR") 52.232-27, (ii) the lapse of BNI's payment bond for the Project without notice to PVS, and (iii) BNI's wrongful withholding of payment to PVS based on PVS's non-remission of payment to its subcontractors for amounts that BNI itself has failed to pay PVS.[1]

7. Regardless of its motives, BNI is in material breach of its contract with PVS, and PVS is due more than $26,000,000.

## PARTIES

8. Plaintiff Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. is an Iowa corporation with its principal place of business located at 501 Avenue H, Carter Lake, IA 51510.

---

[1] Pursuant to FAR 52.232-27, PVS is due to pay its subcontractors seven days after receiving payment from BNI.

9. Defendant Bechtel National Inc. is a Nevada corporation with its principal place of business at 12011 Sunset Hills Road, Suite 110, Reston, VA 20190.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), in that this is a civil action between citizens of the State of Iowa and the State of Nevada and Virginia, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

12. Namely, BNI agreed to remit various payments to PVS at its location in Iowa for its work on the Project; BNI never sent such payments to PVS in Iowa, and this suit concerns BNI's failure to make such payments.

13. BNI impacted PVS's work on the Project and caused PVS to incur damages by, among other things, repeatedly sending changed designs and directives, as well as designs containing errors and omissions, to PVS at its location in Iowa; this suit concerns those changed and erroneous designs and directives sent by BNI to PVS in Iowa.

14. BNI repeatedly refused to acknowledge equitable adjustment due to PVS for BNI's various impacts and changes to the Project by sending denials to requests made by PVS; BNI sent such denials to PVS in Iowa, and this suit concerns those denials and the equitable adjustment sought by PVS therein.

## FACTUAL BACKGROUND

### A. PVS as Steel Fabricator

15. PVS is a structural steel fabricator founded in 1885 and currently based in Carter Lake, Iowa.

3

16. PVS has grown into a company that fabricates steel for projects globally, including both public and private jobs.

17. PVS's work includes stadiums, bridges, nuclear power plants, and industrial projects, among others.

**B. NASA's Mobile Launcher 2 Project**

18. Around 2017, NASA began developing a mobile, ground-based structure for the purpose of launching space rockets.

19. The launcher was intended to support NASA's Artemis program for moon exploration.

20. The launcher will be NASA's second mobile launcher ("ML2" or "Mobile Launcher 2").

21. ML2 constitutes a 355-foot-tall, 11.3-million-pound structure that serves as the primary interface between the ground launch control system and the rocket itself.

22. The ML2 will structurally support rockets, roll them to the launch pad, and stabilize them during each blast.

23. The launcher features "umbilicals"—which constitute swing arms that provide power, gas, communication, and other vitals to the rocket prior to and during the launch process. *See* Ex. A (containing publication from NASA providing information on the ML2).

24. In July 2019, NASA awarded BNI a design-build contract for the ML2 Project.

25. A little less than a year later, BNI entered a contract with PVS, pursuant to which PVS agreed to serve as BNI's primary steel fabricator for the Project.

C. **PVS's Purchase Order**

26. PVS and BNI entered into a contract for the Project in June 2020 (the "Purchase Order").

27. The Purchase Order was primarily structured as a unit price contract based on the weight of steel, with labor, profit, overhead, and other costs considered in determining the unit prices.

28. The Purchase Order contained $19,600,000 in committed funds to PVS for its work, with a "Not to Exceed" amount of $29,000,000 for potential additional costs.

29. The original Purchase Order contemplated the completion of the steel work by the end of 2021.

30. PVS's original expectation when executing the Purchase Order was that BNI would provide it with constructable drawings, from which PVS would fabricate steel for the Project, along with other ancillary components.

31. After its original execution, the Purchase Order was repeatedly revised to address BNI-directed changes to PVS's work; these BNI-directed changes are also at issue in this dispute, as are the impacts to PVS's work that have not been made part of the Purchase Order.

D. **The Process for Steel Fabrication**

32. Steel fabricators generally require "Issued for Construction" ("IFC") design drawings to proceed with steel fabrication.

33. However, steel fabricators do not directly fabricate from IFC design drawings.

34. Instead, fabricators use IFC design drawings to create shop drawings—this process is called "detailing."

35. During the detailing process, a detailer will "translate" design drawings into shop drawings by identifying and breaking down the design drawings into the various steel members and parts that need to be fabricated.

36. For example, a certain type of column may appear 20 times in total throughout the IFC drawings, and that column itself may contain 3 parts.

37. A detailed shop drawing will provide direction to the fabrication shop on how many types of specific parts it needs to cut to construct those columns, as well as direction to minimize the steel waste when creating those columns.

38. The detailing process is necessary for fabrication.

39. The process also frequently results in the discovery of errors and conflicts in the design documents.

### E. BNI's Insistence on Performing the Detailing Work and Creating the Shop Drawings

40. It is industry standard for fabricators to detail their own shop drawings.

41. Despite this, BNI insisted on performing the steel detailing itself and creating the shop drawings for the Project.

42. BNI insisted on this despite PVS's recommendations against it, and it even rejected a credit offered by PVS if it allowed PVS to perform the work.

43. BNI instead gave PVS assurances that it would perform the detailing work properly.

### F. BNI's Issues Creating the Shop Drawings

44. BNI began the detailing process using a team of approximately 5 or 6 detailers.

45. Comparatively, when PVS took on the detailing responsibility later in the Project, it used a team of up to 40 detailers.

46. BNI's team was significantly understaffed, and it did not employ a team of experienced steel detailers.

47. BNI's shop drawings came in slowly and with significant errors.

48. PVS raised issues with BNI as it identified them, and BNI generally directed PVS to continue to fabricate as best as it was able.

49. Two of the major examples that PVS identified included: (i) the weight of the tower for the ML2 exceeded the weight limit of the "crawler" component of the launcher, effectively rendering ML2 immobile; and (ii) the design for major areas of the ML2 were not coordinated with one another.

50. These issues came to a head and ultimately required BNI to put the Project on hold on November 5, 2021.

51. BNI undertook a study of the drawings and uncovered approximately 1,500 errors (with approximately 500 drawings in total for the Project released at that time).

52. Shortly thereafter, BNI requested that PVS take on detailing responsibility for the Project.

**G. March 2022 Purchase Order Revision and Design Edits**

53. In March 2022, the parties formally amended the Purchase Order to include detailing within PVS's scope of work.

54. The updated Purchase Order also contained a new "Not to Exceed" cost of approximately $50,000,000, primarily based on updated expected weight quantities, though with materially less obligated funding.

55. At that point in time, PVS was better able to estimate the final steel weights because it had received copies of the design drawings from BNI.

56. From this period through to the summer of 2022, BNI continued revising its design for the Project.

### H. Updated Design and Work from August 2022 through the End of the Year

57. Around August 2022, the drawings for the Project were still not finalized.

58. Regardless, BNI insisted that PVS began fabricating whatever steel that it could based on the drawings that had been released.

59. The steel industry generally warns that a party should carefully weigh the cost benefits of early release of steel fabrication before the completion of the project design, given the potential for significant costs that may be borne by that party and may outweigh the value of faster project delivery. *See* ANSI/AISC 303-22, Code of Standard Practice for Steel Buildings and Bridges, AISC, at 3.2.2, Commentary.

60. PVS similarly recommended against early fabrication prior to the completion of design, but BNI directed PVS to proceed.

61. Around this same time, PVS also began re-estimating the new but incomplete drawings so that it could update its pricing for the work.

62. However, one consequence of the Project hold in November 2021 is that PVS lost its access to its planned subcontractors and was instead forced to go to the market to seek fabrication support.

63. At that time, steel prices were rising to an all-time high and steel construction began booming following the resumption of projects after COVID.

64. As a result, the amount of available and highly skilled fabricators in the market was limited—resulting in higher ultimate costs and more required fabrication supervision by PVS. costs to fabricate steel.

**I. January 2023 Purchase Order Revision**

65. By January 2023, BNI still had not completed the design for the Project; regardless, at that time the parties executed a new revision to the Purchase Order that further updated the pricing to $71,500,000.

66. The scope of the work also had changed significantly from prior iterations.

67. Two of the major changes included: (i) in the tower, BNI made design changes that required a switch from traditional bolted steel connections to more time-consuming fully shop-welded connections; and (ii) in the base, BNI similarly removed many bolted connections and expanded the number of necessary welds.

68. PVS entered the Purchase Order revision at that time after having received a design schedule from BNI representing that by March 2023 BNI would release all IFC drawings needed for PVS to perform its work, and that the drawings already in effect at the time of the revision were sufficiently complete and accurate so that PVS could perform its work without impact or disruption.

**J. Impacts to PVS's Work in 2023, 2024, and 2025**

69. Following the execution of the January 2023 Purchase Order revision, PVS continued its work, including detailing, and it continued to discover errors and omissions in BNI's design.

70. BNI responded negatively with what it believed to be marginal progress with the work.

71. BNI, however, did not meet its own schedule in releasing the full design by March 2023.

72. On March 31, 2023, BNI issued a schedule suggesting completion of much of the steel work by the end of 2023.

73. PVS was initially agreeable to this schedule, but it was quickly followed by a flow of new design changes from BNI.

74. The parties had weekly schedule calls where PVS informed BNI of the impacts from the changes on PVS's ability to perform its work.

75. In May 2023, BNI provided PVS with a schedule with new requested completion dates.

76. PVS rejected this schedule as unachievable due to BNI's design changes and issues.

77. BNI's pattern of issuing design changes and PVS's discovery of issues in BNI's designs continued through 2025.

78. BNI issued more than 5,000 design changes through the course of the Project, most of which expanded the scope of PVS's work.

79. The parties executed at least 15 revisions to their Purchase Order.

80. The chart below depicts the number of new "Issued for Construction" drawings released by BNI throughout the course of the Project:



81. BNI's flawed and piecemeal release of the steel design for the Project had a significant impact on PVS's ability to perform its work, resulting in higher costs.

82. PVS identified so many issues in BNI's design drawings that it was forced to issue more than 3,000 "Requests for Information" to clarify such issues.

83. By the end of 2023, PVS generally completed fabricating the primary elements in the ML2 base, and beginning in 2024, PVS began detailing and fabricating the "tower" component for the Project.

84. However, by the end of 2023 and early 2024, PVS still had not received any designs at all for ancillary components to both the base and tower, despite its repeated requests to BNI for such designs and its repeated warnings about the time and cost impacts.

85. When BNI provided PVS with these ancillary designs in spring of 2024, many of the elements affected portions of the already fabricated steel.

86. BNI's piecemeal design release continued through 2025.

K. **PVS's Repeated Requests for Equitable Adjustment and Adversity between the Parties**

87. Because of the unintended "fast-track" nature of this Project, many of the design issues and changes were dealt with on an ad hoc basis, and BNI repeatedly directed PVS to proceed with work; BNI assured PVS that BNI would provide compensation for the costs associated with the changes.

88. In processing PVS's requests for equitable adjustment relating to BNI's design issues and changes, BNI would triage certain items while allowing others to linger for months or years.

89. By late 2024, PVS had tens of millions of dollars in Requests for Equitable Adjustments outstanding.

11

90. Around that same time, BNI began accusing PVS of insolvency and other issues on the Project; PVS believes BNI took this position to create leverage and negotiate lower amounts to compensate PVS relating to items for which BNI is responsible and which BNI may not be entitled to receive compensation from NASA.

91. Notably, by the end of summer 2024, NASA itself had become highly critical of BNI's management of the Project.

**L. August 27, 2024 Report by NASA Office of Inspector General**

92. On August 27, 2024, the NASA Office of Inspector General (the "OIG") issued a report following an audit of the Mobile Launcher 2 Project. *See generally* NASA, Office of Inspector General, *NASA's Management of the Mobile Launcher 2 Project*, IG-24-016, August 27, 2024, available at https://oig.nasa.gov/wp-content/uploads/2024/08/ig-24-016.pdf.

93. The OIG undertook the audit because within three years of starting the Project, the contract value had increased from $383 million to over $1 billion in total cost, with delivery delayed by more than three years.

94. The OIG opined that BNI's performance was the primary reason for the significant cost increases and schedule delays to the design and development of the ML2, noting BNI's "underestimation of project scope and complexity along with ongoing technical challenges." *See id.* at 15-16.

95. The OIG explicitly recognized the impact on the Project that resulted from BNI's faulty IFC drawings:

> Since April 2022, there have been setbacks in the steel fabrication process that have impacted the ML-2 project's schedule. As Bechtel continued to work on the ML-2 design, it sent incremental IFCs to the prime subcontractor [PVS] to keep steel fabrication moving forward. [fn 30 NASA agreed with Bechtel's decision to incrementally release the IFCs, but the drawback was that the steel

fabricators were not sure if they had a complete or partial steel design.] Once [PVS] created the [detailed shop drawings]—based on the incremental IFCs—and sent them to the steel fabrication shops, the shops sent back over 3,000 Requests for Information (RFI) about the steel design. ML-2 project management reported that this was an excessive number of RFIs, which suggested to them that Bechtel's design was unclear to the steel fabrication shops.

While Bechtel revised its IFCs in response to the RFIs, according to ML-2 project management, the company did not allot sufficient time in its schedule to do so, and this iterative process resulted in cost increases and schedule delays. In mid-2023, ML-2 project management found the delays in steel fabrication and delivery resulted in a 3-month schedule slip, leaving Bechtel with no additional schedule reserve to meet the May 2026 contract end date. Further, project management is tracking additional risks related to steel fabrication delays, which could potentially add $50 million to $85 million to Bechtel's steel fabrication contract.

Additionally, Bechtel has had difficulties managing its numerous subcontractors. In mid-2021, ML-2 project management noted that Bechtel's "interactions and business relationship with the steel fabricator deteriorated to the point of dysfunction," resulting in unresolved fabrication issues that impacted the ML-2 project's critical path. Bechtel's lack of awareness and oversight of critical second-tier subcontractors responsible for steel fabrication contributed to a delayed construction start date. One subcontractor, which Bechtel allocated approximately 46 percent of the fabrication work to, sold all of its shop space to a non-NASA customer because Bechtel's steel fabrication plan lacked a signed contract with the subcontractor. As a result, Bechtel attempted to find another subcontractor with available shop space but was unable to do so in a timely manner. The delay in the steel fabrication process continued to impact the ML-2 project's schedule.

Moreover, Bechtel did not take into consideration the lack of resources at the subcontractor level, which included an insufficient number of certified welders and amount of shop space. By spring 2023, Bechtel had made efforts to improve its subcontractor management by working with the prime steel fabrication subcontractor to bring on additional second-tier subcontractors to complete fabrication work. Bechtel also contracted with a second steel fabrication subcontractor with the intent that another steel fabricator could help move fabrication forward. While Bechtel continued to experience cost and schedule issues associated with its subcontractors, according to ML-2 project management, the

13

company's steel deliveries have shown improvement, with no additional delays from October 2023 through April 2024.

*Id.* at 18-19.

96. The OIG also recognized that it took until March 2024 until BNI was able to stabilize the weight issues with the steel design that otherwise threatened the mobility of the launcher. *Id.* at 19-20.

### M. **BNI's Responsive Actions to PVS's Efforts to Receive Payment**

97. By early May 2025, PVS had substantially completed its work on the Project and pursuant to its agreement with BNI.

98. At that time, PVS maintained approximately $20,000,000 in requests for equitable adjustment pending with BNI.

99. In late May 2025, BNI went on the offensive and accused PVS of being in default of the parties' agreement.

100. BNI specifically claimed that it had concerns about PVS's financial solvency and ability to perform its obligations under the agreement, even though PVS's work was substantially complete after almost five years of repeated disruptions from BNI and even though PVS's performance was guaranteed by a performance bond in excess of $100,000,000.

101. BNI also raised concerns about unpaid subcontractors of PVS, even though BNI was the primary cause of any non-payment.

102. BNI cited provisions in the parties' agreement requiring indemnification for any subcontractor claims, even though BNI had no exposure to any claims given that (i) BNI did not

14

maintain any payment bond for the Project,[2] (ii) the Project was not lienable, and (iii) BNI did not have privity with any of PVS's subcontractors for PVS's work.

103. On these pretenses, BNI advised PVS that it would be withholding all future payments to PVS until PVS met a list of demands beyond those required by the parties' agreement or justified by the circumstances, including a demand for payment bonds from PVS that would collectively total more than $70,000,000.

104. BNI raised all of these claims despite that it subjected PVS to two separate financial audits during the Project—one by an inhouse team assembled by BNI and the other by a financial auditor; the outside audit revealed that PVS was in fact undercharging BNI in its pricing.

105. At that time, BNI advised that it had received more than $5,000,000 from NASA and due to PVS, but it would be withholding such payment.

106. Thereafter, PVS advised BNI that all amounts due to its subcontractors solely consisted of amounts that BNI itself had failed to pay PVS.

107. Despite this, BNI continues to withhold payment to PVS on the basis that certain of PVS's subcontractors have not been paid in full.

## COUNT I
### (Breach of Contract)

108. PVS restates and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

---

[2] The Miller Act requires all contractors for federal projects over $150,000.00 to maintain payment bonds to ensure that their subcontractors have an avenue for relief in the event of non-payment. 40 U.S.C. §§ 3131–3134. Though BNI originally posted a payment bond at the start of the Project, the bond expired in 2022, and BNI failed to inform PVS and any of PVS's subcontractors of that fact. PVS learned such information directly from NASA in 2025, when it sought to ensure that BNI remained financially viable.

109. PVS and BNI entered an agreement pursuant to which PVS agreed to furnish steel and other components to the Project (the "Work") and perform various services in the process of such furnishing in exchange for payment from BNI.

110. In addition to the above, BNI agreed to various other obligations, including but not limited to:

    a. Furnishing plans and specifications that were adequate and sufficient to permit PVS to perform its Work;

    b. Making decisions and providing information within the scope of its control and/or responsibility promptly, to enable PVS to perform its Work;

    c. Refraining from interfering with PVS's performance of its Work generally; and

    d. Compensating PVS for cost and time impacts caused by BNI to the performance of PVS's Work.

111. Throughout the Project, BNI repeatedly breached its contractual obligations to PVS by doing the following, among other things:

    e. Furnishing plans and specifications that were inadequate and insufficient to permit PVS to perform its Work;

    f. Failing to make decisions and provide information within the scope of its control and/or responsibility promptly to enable PVS to perform its Work;

    g. Interfering with PVS's performance of its Work; and

    h. Failing to compensate PVS for all of its cost and time impacts cause by BNI to the performance of PVS's Work.

112. BNI also breached its agreement with PVS insofar as it has wrongfully withheld money from PVS that is due, notwithstanding BNI's wrongful withholding.

113. As a result of BNI's breaches, PVS has incurred damages in excess of $26,000,000, in an amount to be determined at trial.

WHEREFORE, Plaintiff Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. respectfully requests that the Court enter judgment in its favor and against the Defendant in an amount in excess of $26,000,000.00 and to be determined at trial, together with pre and post-judgment interest as provided under the parties' agreement and pursuant to law, costs, and such further relief as the Court deems equitable and just.

## COUNT II
### (Quantum Meruit)
### (in the Alternative to Count I)

114. PVS restates and incorporates by reference each of the allegations set forth in the preceding paragraphs 1 through 107 of this Complaint.

115. BNI requested PVS furnish various benefits to BNI for its use on the Project, including but not limited to labor, materials, supervision, and engineering services.

116. PVS conferred such benefits at the request of BNI.

117. BNI accepted those benefits but has failed to pay PVS the reasonable value thereof.

118. PVS has been damaged as a result of BNI's failure to pay PVS the reasonable value for the benefits conferred.

WHEREFORE, Plaintiff Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. respectfully requests that the Court enter judgment in its favor and against the Defendant in an amount in excess of $26,000,000.00 and to be determined at trial, together with pre and post-judgment interest, costs, and such further relief as the Court deems equitable and just.

## COUNT III
### (Quantum Meruit)
### (in the Alternative to Counts I and II)

119. PVS restates and incorporates by reference each of the allegations set forth in the preceding paragraphs 1 through 107 of this Complaint.

120. PVS conferred various benefits to BNI for use on the Project, including but not limited to labor, materials, supervision, and engineering services.

121. PVS did so with a reasonable expectation of compensation.

122. BNI was aware of or should have been aware of such benefits, and it accepted and retained them.

123. BNI, however, has failed to pay PVS the reasonable value thereof.

124. PVS has been damaged as a result of BNI's failure to pay PVS the reasonable value for the benefits conferred.

WHEREFORE, Plaintiff Owen Industries, Inc. d/b/a Paxton & Vierling Steel Co. respectfully requests that the Court enter judgment in its favor and against the Defendant in an amount in excess of $26,000,000.00 and to be determined at trial, together with pre and post-judgment interest, costs, and such further relief as the Court deems equitable and just.

Respectfully submitted,

BELIN McCORMICK, P.C.

 /s/ Matthew D. Callanan
Matthew D. Callanan                               AT0011813
666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone: (515) 283-4639
Facsimile: (515) 558-0639
mdcallanan@belinmccormick.com

and

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.


 */s/ Edward Seglias*
Edward Seglias (*Pro Hac Vice Forthcoming*)
Matthew Skaroff (*Pro Hac Vice Forthcoming*)
1600 Market Street, 32nd Floor
Philadelphia, PA 19103
(215)-430-3382

P0969\0001\(4717661.2)